**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| LUCRETIA STONE, | : | |
| | : | Civil Action No. 14-3697(MCA) |
| Petitioner, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| VALERIE AUTHOR, *et al.*, | : | |
| | : | |
| Respondents. | : | |

**MADELINE COX ARLEO, District Judge:**

## I.   INTRODUCTION

This matter has been opened to the Court by petitioner Lucretia Stone's ("Petitioner")

filing of a pro se Petition (ECF No. 3) for a writ of habeas corpus pursuant to 28 U.S.C. § 2254,

seeking an evidentiary hearing and a writ of habeas corpus. For the reasons explained in this

Opinion, the Court will deny the Petition and will also deny a certificate of appealability.

## II.   FACTUAL BACKGROUND & PROCEDURAL HISTORY[1]

### A.  Factual Background

Petitioner was indicted on charges growing out of a fire at a Jersey City multi-family

dwelling in the early morning hours of May 30, 1997. She lived in the building's illegal

basement apartment and had a contentious relationship with the resident landlords, Krishna and

Arawattie Ramnanana. Although most apartment residents escaped the May 30 apartment blaze,

three children who also lived in the building died in the fire. Investigators determined that the

---

[1] This brief factual overview is taken from the Appellate Division Opinions denying Petitioner's
direct appeal and affirming the denial of her Petition for Post-Conviction Relief. (*See* ECF No.
18-20 at 4-5; *State v. Stone*, 2008 WL 539254, at *1 (N.J. Super. Ct. App. Div. Feb. 29, 2008.)

fire was set with the use of the accelerant gasoline, and there was testimony at trial that Petitioner purchased a small amount of gasoline in the early morning hours of May 30, 1997.

Following a jury trial, Petitioner was found guilty of three counts of second-degree reckless manslaughter, three counts of first-degree felony murder, and one count of arson and was acquitted on the charge of aggravated arson. The sentencing judge merged the reckless-manslaughter and arson convictions into the felony-murder convictions. After finding aggravating factors one and nine and mitigating factor seven, the judge sentenced her to three consecutive life terms in prison with a ninety-year period of parole ineligibility. (*See* ECF No. 18-45 at 1-2.)

## B. **Procedural History**

Petitioner appealed her conviction and sentence. The Appellate Division affirmed the conviction, but modified the sentence to three concurrent terms of life imprisonment with a thirty-year parole disqualifier. *See State v. Lucretia Stone*, No. A-3307-99 (App. Div. Aug. 4, 2003). (ECF No. 18-20.) The Supreme Court denied Stone's petition for certification. *State v. Stone*, 178 N.J. 36 (2003). (ECF No. 18-21.)

In 2004, Stone filed a petition for post-conviction relief ("PCR"). (ECF No. 18-22.) The trial court denied the petition in April 2006. (ECF Nos. 18-30, 18-31.) The Appellate Division affirmed the trial court on February 29, 2008. *State v. Lucretia Stone*, No. A-5317-05 (App. Div. Feb. 29, 2008). (ECF No. 18-39.) The Supreme Court denied Stone's petition for certification. *State v. Stone*, 195 N.J. 524 (2008). (ECF No. 18-41.)

On or about November 10, 2007, while her PCR appeal was still pending, Stone filed a pro se motion for a new trial based on newly discovered evidence ("New Trial Motion").[2] The

_____

[2] The record reflects that Petitioner also attempted to raise this issue in pro se supplemental brief

trial court denied the motion on April 29, 2011 and the Appellate Division affirmed the trial court's decision on May 22, 2013. (ECF Nos. 18-42-18-45; 18-97; 18-47.)

Petitioner, currently incarcerated at Edna Mahan Correctional Facility, submitted her habeas petition to prison officials for filing on June 3, 2014. (ECF No. 1, Pet. at 16.) The matter was assigned to the Honorable Faith S. Hochberg. The Court administratively terminated the proceeding on July 14, 2014 for Petitioner's failure to comply with L. Civ. R. 81.2(a). (ECF No. 2.) Petitioner thereafter submitted an amended habeas petition to prison officials on August 5, 2014 on the correct form ("Amended Petition"). (ECF No. 3, Pet. at 22.) The Amended Petition with 44 pages and 2 addenda sets forth nine separate grounds for habeas relief. (ECF No. 3.)

The Court screened the Amended Petition and issued an Order to Show Cause on September 18, 2014, requiring Petitioner to explain why her Amended Petition should not be dismissed as time-barred under the one-year statute of limitations prescribed by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"). (ECF No. 4.) On October 23, 2014, Petitioner filed a Response to the Order to Show Cause, addressing the issue of the Amended Petition's timeliness. (ECF No. 5.)

On December 5, 3014, the matter was transferred to the undersigned. (ECF No. 6.) This Court reviewed Petitioner's October 23 submission and, on May 4, 2016, ordered the State to provide a full answer; the Court reserved decision on the issue of the Amended Petition's timeliness. (ECF No. 9.) On June 7, 2016, Respondents filed a motion to dismiss the Amended Petition on timeliness grounds, arguing that the Petition was untimely because Petitioner was not

_____

on appeal of the denial of her PCR (*see* ECF No. 18-38), but it does not appear that the Appellate Division addressed the issue on PCR. In any event, Petitioner subsequently filed the New Trial Motion while her PCR appeal was pending.

entitled to statutory tolling for her New Trial Motion. (ECF No. 11.) On September 12, 2016,

Petitioner filed a Reply Memorandum in Support of Petition for Writ of Habeas Corpus. (ECF

No. 13.) On January 27, 2017 the Court denied Respondents' June 8, 2016 motion to dismiss

finding that Respondents had not met their burden to show that the Petition is untimely, and

ordered Respondent to provide a full and complete answer to the Petition. (ECF Nos. 14 and 15.)

Respondents filed their full Answer on March 24, 2017.[3] (ECF No. 18.) The matter is fully

briefed and ready for disposition.

## III.   TIMELINESS

As noted above, on January 27, 2017, the Court denied Respondents' motion to dismiss,

finding that Respondents had not met their burden to show that the Petition is untimely, and

ordered Respondent to provide a full and complete answer to the Amended Petition. The Court's

Memorandum Opinion set forth the Court's reasons for denying the motion to dismiss, which

need not be recounted here. The Memorandum Opinion permitted Respondents to renew their

timeliness arguments with proper supporting authority in their full Answer. In their full Answer,

Respondents have not provided any additional analysis of the relevant issues. For that reason, the

Court declines to find the Amended Petition untimely, and will proceed to the merits.

## IV.   STANDARD OF REVIEW

Section 2254(a) permits a court to entertain only claims alleging that a person is in state

custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §

---

[3] Petitioner had until Monday, April 24, 2017 to file a reply to Respondents' March 24, 2017
Answer. *See* ECF No. 15 at 3 (January 27, 2017 Order: "Petitioner may file and serve a reply to
the Answer within 30 days after Respondents file the Answer, *see* Rule 5(e) of the Rules
Governing § 2254 Cases.")) Petitioner has not submitted any filings to this Court either before or
after the April 24 deadline.

4

2254(a). Petitioner has the burden of establishing each claim in the petition. *See Eley v. Erickson*,

712 F.3d 837, 846 (3d Cir. 2013). Under 28 U.S.C. § 2254, as amended by AEDPA (28 U.S.C. §

2244), federal courts in habeas corpus cases must give considerable deference to determinations

of state trial and appellate courts. *See Renico v. Lett*, 599 U.S. 766, 772 (2010).

Section 2254(d) sets the standard for granting or denying a writ of habeas corpus:

> (d) An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim-
>
> > (1) resulted in a decision that was contrary to, or involved
> > an unreasonable application of, clearly established Federal
> > law, as determined by the Supreme Court of the United
> > States; or
> >
> > (2) resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence presented
> > in the State court proceeding.

28 U.S.C. § 2254(d).

Where a state court adjudicated a petitioner's federal claim on the merits,[4] a federal court

"has no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was

contrary to, or involved an unreasonable application of, clearly established Federal Law, as

determined by the Supreme Court of the United States,' or 'was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding.'"

*Parker v. Matthews*, 567 U.S. 37, 40-41 (2012) (quoting 28 U.S.C. § 2254(d)).

"[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as

---

[4] "For the purposes of Section 2254(d), a claim has been 'adjudicated on the merits in State court
proceedings' when a state court has made a decision that (1) finally resolves the claim, and (2)
resolves th[at] claim on the basis of its substance, rather than on a procedural, or other, ground."
*Shotts v. Wetzel*, 724 F.3d 364, 375 (3d Cir. 2013) (citation and internal quotation marks
omitted).

opposed to the dicta, of t[he Supreme Court's] decisions," as of the time of the relevant state-court decision. *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d) (1) if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." *Williams*, 529 U.S. at 405-06. Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. As to 28 U.S.C. § 2254(d)(1), a federal court must confine its examination to evidence in the record. *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of the AEDPA necessarily apply. First, the AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 29 U.S.C. § 2254(e)(1); *see Miller–El v. Dretke*, 545 U.S. 231, 240 (2005). Second, the AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

In addition to the above requirements, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To do so, a petitioner must "'fairly present' all federal

6

claims to the highest state court before bringing them in federal court." *Leyva v. Williams*, 504

F.3d 357, 365 (3d Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.*, 295 F.3d 361, 369 (3d Cir.

2002)). This requirement ensures that state courts "have 'an initial opportunity to pass upon and

correct alleged violations of prisoners' federal rights.'" *Id.* (citing *United States v. Bendolph*, 409

F.3d 155, 173 (3d Cir. 2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)).

Even when a petitioner properly exhausts a claim, a federal court may not grant habeas

relief if the state court's decision rests on a violation of a state procedural rule. *Johnson v.*

*Pinchak*, 392 F.3d 551, 556 (3d Cir. 2004). This procedural bar applies only when the state rule

is "independent of the federal question [presented] and adequate to support the judgment."

*Leyva*, 504 F.3d at 365-66 (citing *Nara v. Frank*, 488 F.3d 187, 196, 199 (3d Cir. 2007); *see also*

*Gray v. Netherland*, 518 U.S. 152 (1996), and *Coleman v. Thompson*, 501 U.S. 722 (1991)).

If a federal court determines that a claim has been defaulted, it may excuse the default only upon

a showing of "cause and prejudice" or a "fundamental miscarriage of justice." *Leyva*, 504 F.3d at

366 (citing *Lines v. Larkins*, 208 F.3d 153, 166 (3d Cir. 2000)).

To the extent that a petitioner's constitutional claims are unexhausted and/or procedurally

defaulted, a court can nevertheless deny them on the merits under 28 U.S.C. § 2254(b)(2). *See*

*Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007) ("Here, because we will deny all of

[petitioner's] claims on the merits, we need not address exhaustion"); *Bronshtein v. Horn*, 404

F.3d 700, 728 (3d Cir. 2005) (considering procedurally defaulted claim, and stating that "[u]nder

28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly

exhausted, and we take that approach here").

## V.  ANALYSIS

The Amended Petition raises nine separate grounds for relief, which the Court addresses

7

in order. For the reasons explained in this section, the Court finds that Petitioner's claims do not warrant federal habeas relief.

## A. Ground One: Printout as Newly Discovered Evidence

Ground One of the Amended Petition alleges that Petitioner was deprived of her Due Process rights to a fair trial when the state court denied her motion for a new trial based on newly discovered evidence of a computer printout ("Printout") detailing the purchases of gasoline. (ECF No. 3 at 35) ("Newly Discovered Evidence Claim"). Petitioner also states in connection with this claim that she is asserting an "actual innocence" claim. (*Id.* at 37.)

During pendency of Petitioner's appeal from the March 30, 2006 PCR court decision (ECF Nos. 18-30 and 18-31) denying her PCR petition, Petitioner filed a November 2007 Motion for a New Trial Based on Newly Discovered Evidence.[5] (ECF No. 18-42.) The purported newly discovered evidence giving rise to her Motion consisted of an Exxon gas station computer printout reflecting certain gasoline sales made at an Exxon station on the night of May 29, 1997 and into the early morning of May 30, 1997, during the time Stone was alleged to have purchased the gasoline used in connection with the arson.[6] Petitioner argued that a new trial was required because the Printout <u>did not</u> reflect the purchase of the small amount of gasoline she was alleged to have bought and, consequently, could have been used to impeach the witnesses who testified that she was the person who made the purchase. More specifically, Petitioner alleges that the only $0.25 purchase documented in the Printout was a non-fuel purchase, a fact Petitioner believes exonerates her from guilt for the fire. (ECF No. 3 at 37.)

---

[5] New Jersey Court Rules 3:20-2 and 3:22-12 permits the filing of a motion for a new trial based on newly discovered evidence or for other collateral relief based on such evidence.

8

Although the Printout had been produced by the State prior to trial, it was not used at

trial. According to Stone, it had been "misplaced." (ECF No. 18-45 at 3.) The motion judge

heard oral argument on April 29, 2011, and then placed an oral decision on the record. The trial

court denied the motion, finding that the Printout was not "newly discovered," that Stone's

motion for a new trial was time barred, and that, even if the court put the procedural bars aside,

the evidence, had it been used at trial, would not have changed the result.[7] The PCR judge

explained his reasons as follows:

> Even if the Court were to put the procedural bars aside the
> result would be the same. This petition is clearly without merit.
> The significance the defendant attaches to the computer printout
> here is grossly overstated. One need only review the statement of
> facts set forth in the appellate opinion denying the defendant's
> direct appeal to see the evidence ... of the defendant's guilt was
> overwhelming.
>
> The defendant's argument here is that had the computer
> printout, which did not note the cash purchase of ten to 15 cents
> worth of gasoline[,] been introduced at trial it would somehow
> prove, "the innocence of the defendant and the impossibility of her
> being the purchaser of gasoline." There is no evidence either in the
> trial record or in support of this motion which would establish that
> the printout relied upon reported anything other than purchases
> made using either credit or debit cards for bulk purchases. Insofar
> as the evidence at trial established the defendant purchased the
> gasoline using cash, its absence on a credit/debit card printout
> would be at best marginally relevant.
>
> Additionally, the evidence produced at trial establishing the
> defendant as the purchaser of the gasoline was extraordinarily
> reliable and credible. The defendant was identified by both gas
> station employees as the purchaser of the gasoline. Mohammad
> [Zafar], who knew the defendant as a regular customer, testified
> that she came to the station on the evening in question wearing a
> tuxedo, bought a pack of cigarettes and left the convenience store
> area. She then entered the pump area and spoke to the other
> attendant, one Gregorio Bara who was attending the gas pumps.

---

[7] The trial court further found that Petitioner could not satisfy the requirements for a *Strickland* claim premised on her trial counsel's failure to use the printout at trial. (*See* ECF No. 18-97.)

> Bara identified the defendant as the woman dressed in a tuxedo to whom he sold ten to 15 cents worth of gasoline that evening.
>
> Further testimony established that the defendant had attended a formal affair dressed in a tuxedo just prior to visiting the gas station. To suggest that a marginally relevant printout would, in light of the overwhelming evidence establishing the defendant as the purchaser of the gasoline, have [a]ffected the outcome of the trial is completely without merit.

ECF No. 18-97 at 9-11.)

The Appellate Division affirmed the denial of the new trial motion. Although the

Appellate Court was silent on the issue of timeliness, it agreed that the evidence was not newly

discovered, and that the use of the printout at trial would not have changed the result. *See State v.*

*Stone*, No. A-4837-10T2, 2013 WL 2217493, at *3 (N.J. Super. Ct. App. Div. May 22, 2013). As

the Appellate Division observed:

> The motion judge found that the Printout [was] made available to the defense prior to trial and that use of the [P]rintout at trial would not have changed the results. The former is conceded. We agree with the judge's conclusion as to the latter. The evidence against Stone at trial was overwhelming and the testimony concerning her purchase of gasoline would not have been undercut by the documents at issue.

(ECF No. 18-45 at 6.)

In her Amended Petition, Petitioner appears to assert a claim of actual innocence based

on newly discovered evidence.[8] Currently, the Supreme Court treats actual innocence as a

gateway for consideration of procedurally defaulted claims.[9] *See McQuiggin v. Perkins*, ⸺ U.S.

⸺, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013); *Schlup v. Delo*, 513 U.S. 298, 327–29 (1995)

---

[8] To the extent Petitioner failed to exhaust her actual innocence claim, the Court is free to deny it on the merits. *See Taylor*, 504 F.3d at 427.

[9] Grounds Seven, Eight, and Nine of the Amended Petition are procedurally defaulted. As explained below, the Court finds that the newly discovered evidence does not meet the standard for a gateway claim.

(requiring a showing "that it is more likely than not that no reasonable juror would have convicted [the petitioner] in the light of the new evidence"). The Supreme Court has not yet recognized the existence of a freestanding claim of actual innocence. *See McQuiggin*, 133 S.Ct. at 1931; cf. *In re Davis*, 557 U.S. 952 (2009); *see also Wright v. Superintendent Somerset SCI*, 601 F. App'x 115, 119 (3d Cir.), *cert. denied sub nom. Wright v. Wingard*, 136 S. Ct. 241, 193 L. Ed. 2d 180 (2015), *reh'g denied*, 136 S. Ct. 580, 193 L. Ed. 2d 462 (2015).

In *Herrera v. Collins*, 506 U.S. 390 (1993), the Supreme Court explained that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id.* at 400. The petitioner in *Herrera* was not entitled to habeas relief because he did not seek excusal of his procedural default; rather, he argued that newly discovered evidence showed that his conviction was factually incorrect. *Id.* at 404–05. However, the *Herrera* Court left open the possibility of a freestanding claim of actual innocence – at least in the capital context. *See id.* at 417 (O'Connor, J., concurring) (assuming "that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim" and finding that the threshold for such a claim would "be extraordinarily high). Subsequently, in *House v. Bell*, 547 U.S. 518, 555 (2006) the Supreme Court held that the Petitioner, who presented newly discovered forensic evidence, narrowly satisfied the gateway standard set forth in *Schlup* and could therefore proceed on remand with procedurally defaulted constitutional claims but did not satisfy the extremely high threshold for freestanding actual innocence claim. *See also Han Tak Lee v. Glunt*, 667 F.3d 397 (3d Cir. 2012)

11

and *Albrecht v. Horn*, 485 F.3d 103 (3d Cir. 2007) (addressing actual innocence claims in context of expert testimony).

Here, even assuming a freestanding claim of actual innocence is cognizable under § 2254, the evidence provided by Petitioner does not meet the "extraordinarily high" standard of proof required for such a claim. Indeed, Petitioner does not even meet the standard for a gateway claim under *Schlup*, 513 U.S. at 327–29, which requires a showing "that it is more likely than not that no reasonable juror would have convicted [the petitioner] in the light of the new evidence[.]" Having reviewed the relevant record, the Court finds that the Appellate Division did not err in determining that (1) the printouts were not new evidence and that (2) the admission of the printouts, which showed bulk credit purchases, would were only marginally relevant in light of the testimony identifying Petitioner as the purchaser of the gasoline. For these reasons, the Court will deny habeas relief on Ground One.

## B. Ground Two: Ineffective Assistance Of Counsel in Connection with the Printout

Ground Two claims that Petitioner's Sixth Amendment rights were violated "by counsel's failure to investigate, obtain and analyze the [P]rintout of sales at the gas station which was evidence of Petitioner's innocence." (ECF No. 3 at 43.) Such claims are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984). To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient. This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007). To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d]

of a fair trial ... whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at
299. In evaluating whether counsel was deficient, the "proper standard for attorney performance
is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005). A
petitioner asserting ineffective assistance must therefore show that counsel's representation "fell
below an objective standard of reasonableness" under the circumstances. *Id.* The reasonableness
of counsel's representation must be determined based on the particular facts of a petitioner's
case, viewed as of the time of the challenged conduct of counsel. *Id.* In scrutinizing counsel's
performance, courts "must be highly deferential ... a court must indulge a strong presumption
that counsel's conduct falls within the wide range of reasonable professional assistance."
*Strickland*, 466 U.S. at 689.

Even where a petitioner is able to show that counsel's representation was deficient, the
petitioner must still affirmatively demonstrate that counsel's deficient performance prejudiced
the petitioner's defense. *Id.* at 692-93. "It is not enough for the defendant to show that the errors
had some conceivable effect on the outcome of the proceeding." *Id.* at 693. The petitioner must
demonstrate that "there is a reasonable probability, but for counsel's unprofessional errors, the
result of the proceeding would have been different. A reasonable probability is a probability
sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at
299. "Because failure to satisfy either prong defeats an ineffective assistance claim, and because
it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*,
466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a
petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002); *Judge v. United
States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

13

Finally, when a federal habeas petition under § 2254 is based upon an ineffective assistance of counsel claim, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable," which "is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Grant v. Lockett*, 709 F.3d 224, 232 (3d Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* (internal quotation marks omitted) (emphases in original). "A state court must be granted a deference and latitude that are not in operation when the case involves [direct] review under the *Strickland* standard itself." *Id.* Federal habeas review of ineffective assistance of counsel claims is thus "doubly deferential." *Id.* (quoting *Cullen v. Pinholster*, 131 S.Ct. at 1403). Federal habeas courts must "take a highly deferential look at counsel's performance" under *Strickland*, "through the deferential lens of § 2254(d)." *Id.* (internal quotation marks and citations omitted).

Here, Petitioner asserts ineffective assistance of counsel in connection with the failure to use the Printout to dismiss the indictment and/or at trial. By way of background, Petitioner asserts that her original public defender ("Walsh") planned to use the Printout to support a motion to dismiss the indictment (ECF No. 3 at 35); after his removal as Petitioner's counsel, Mr. Walsh gave a copy of the Printout to Petitioner's subsequent counsel, as part of a complete copy of her original discovery in this case. (ECF No. 11-10 at 11; ECF No. 3 at 36.) Petitioner, not realizing that the Printout was crucial to her case, mailed the Printout to her mother for unspecified reasons sometime between the removal of Mr. Walsh as her first attorney and the appointment of her second counsel ("Desmond" and "DeJulio"). (ECF No. 11-10 at 10-13.) When Petitioner told her new counsel that the Printout was essential to her case, they told her

14

that the Printout did not exist and that they would not investigate the issue further. (ECF No. 3 at

35-37; ECF No. 11-10 at 11.) Thereafter, Petitioner's counsel on direct appeal ("Smith") advised

Petitioner via letter in August 2003 that his search in the file for the Printout had been

unsuccessful. (ECF No. 3 at 36.) During preparation for her PCR petition, Petitioner requested

that her mother check her correspondence records, and the Printout was located among her

mother's files. (ECF No. 3 at 37.) Petitioner's PCR counsel declined to use the Printout in PCR

briefings and urged Petitioner to request that her trial counsel file a motion for new trial. (ECF

No. 3 at 37; ECF No. 11-10 at 12.)

In addition to rejecting the new trial motion, the motion judge determined that the claim

also failed as a second PCR under *Strickland*, explaining:

> The defendant received at all levels here involved adequate
> assistance from counsel, none can be faulted for failing to raise a
> meritless argument. Even if counsel's performance could be
> considered as ineffective, she was not prejudiced thereby.
> Therefore, she satisfies neither prong of the Strickland test and the
> petition would be and is denied.

(ECF No. 18-97, Tr. Motion Hearing at 11.)

On appeal, Petitioner argued that "prior counsel were ineffective in failing to obtain and

analyze the Printout which was evidence of Defendant's innocence." (ECF No. 18-45 at 5.) The

Appellate Division found that it "would reach the same result on the merits even if [the court]

were to treat the motion as a second PCR petition based upon ineffective assistance of counsel in

failing to use the documents at trial . . . Even assuming that trial counsel should have used the

printouts during cross-examination, [the court is] convinced that the result would not have

changed for the reasons already stated. Consequently, Stone cannot satisfy the second prong of

the *Strickland* test. The trial judge correctly denied her petition for PCR." (*Id.* at 6-7.)

15

Here, the Court agrees that even assuming that one or more of her attorneys were ineffective for failing to investigate or use the printouts, Petitioner cannot show that she was prejudiced in light of the marginal value of the printouts. As such, Petitioner cannot meet *Strickland's* prejudice prong. The Court will therefore deny habeas relief on Ground Two.

### C. Ground Three: Admission Of Evidence Concerning Petitioner's Silence

In Ground Three, Petitioner alleges deprivation of her "Due Process right to a fair trial by the trial court permitting the prosecutor to present evidence that after being placed in custody, [she] failed to ask the police about conditions at the fire scene and [permitting the prosecutor] to argue in summations that this silence was the evidence that convicts her." (ECF No. 3 at 39.)

On direct appeal, Petitioner argued that her right to remain silent was violated when the trial judge permitted the prosecution to ask Officer Fortunato, who encountered Petitioner shortly after the fire, whether she inquired about the conditions of her apartment after the fire and comment on it in summation.

The assistant prosecutor concluded his direct examination of Officer Fortunato at trial by asking if petitioner had inquired about the condition of the apartment or the fire scene when speaking with the officer. (20T:55-16 to 22; 20T:57-15 to 20.) The questions elicited an objection from defense counsel, who asserted that the inquiry was intended to improperly elicit an adverse inference from petitioner's silence. (20T:56-3 to 11.) The assistant prosecutor countered that because petitioner was not in custody for *Miranda* purposes during her discussion with the officer, he was therefore entitled to ask the questions. (20T:56-12 to 57 -5.) In response, Judge O'Halloran initially stated that petitioner was in custody at the time, but overruled the objection after the assistant prosecutor argued that the officers were "treating [petitioner ] as a victim." (20T:57- 6 to 9.) During the brief questioning that followed, Officer Fortunato testified

16

that petitioner did not ask about her apartment or the condition of the premises. (20T:57-15 to

20.) Fortunato's testimony was the subject of the following comment by the prosecutor in

summation:

> [Stone] ran right out of [the slipper] and left the scene . . . [T]he
> pocketbook is what this woman is worried about in the middle of
> the night, not did anybody get injured in that fire scene? Did my
> apartment burn down? What's going on back at that fire scene?
> No, she doesn't ask that question that a reasonable person would
> ask.

(ECF No. 18-17 at 2, 50 - 58; ECF No. 18-90 at 8–10.) The State argued that the evidence did

not violate Petitioner's right to remain silent because she was not under arrest at the time in

question. (ECF No. 18-17 at 52.)

The Appellate Division found no error in permitting the evidence or the comment on it:

> Even assuming that defendant was under arrest at the time, we
> conclude that there was no error in permitting the testimony or the
> comment. We note that Jersey City Detective Randy Sandifer
> testified that, while in custody, defendant 'continually blurted out
> that she did not set any fires and that she was in the basement
> apartment when it started' . . . Thus, the jury heard testimony that
> defendant was cooperative and willing to speak about the fire. The
> prosecutor's comment was not about defendant's silence. In fact,
> the witness was talking about the events. There was no post-arrest
> 'silence' under circumstances where an innocent person would be
> expected to speak. A prosecutorial comment on silence under those
> circumstances would have been improper. Here, the comment was
> not on silence, but on defendant's choice of topics. Defendant has
> a right to remain silent, and no adverse inference can be drawn
> from the exercise of such right. She, however, does not enjoy a
> right to have her remarks exempt from scrutiny.

(ECF No. 18-20 at 19 - 20.)

Here, the Appellate Division did not unreasonably apply *Miranda v. Arizona*, 384 U.S.

436 (1966) and its progeny in ruling that prosecutorial comments were not about Petitioner's

silence. (ECF No. 18-20 at 20.) "*Miranda* warnings carry the Government's 'implicit assurance'

that an arrestee's invocation of the Fifth Amendment right to remain silent will not later be used against him." *Gov't of the V.I. v. Martinez*, 620 F.3d 321, 335 (3d Cir. 2010) (quoting *Gov't of the V.I. v. Davis*, 561 F.3d 159, 163-64 (3d Cir. 2009)). It is a violation of the Fifth Amendment and the Due Process Clause "for a prosecutor to cause the jury to draw an impermissible inference of guilt from a defendant's post-arrest silence" after a defendant is Mirandized. *Hassine v. Zimmerman*, 160 F.3d 941, 947 (3d Cir. 1998)). In *Doyle v. Ohio*, 426 U.S. 610, 617-18, (1976), the United States Supreme Court held that "every post-arrest silence is insolubly ambiguous" because it "may be nothing more than the arrestee's exercise of [her] *Miranda* right." *Doyle* errors of prosecutorial comment on a defendant's post-arrest silence can be harmless if the Government "prove[s] beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Davis*, 561 F.3d at 165 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). This analysis requires an examination of "the totality of the circumstances." *Martinez*, 620 F.3d at 337-38. The question becomes whether the "constitutional trial error was harmless beyond a reasonable doubt." *Davis*, 61 F.3d at 165.

Furthermore, not every reference to a defendant's silence results in a *Doyle* violation. There is no due process violation when a prosecutor comments on a defendant's pre-arrest silence or failure to come forward because there has been no "implicit promise that his choice of the option of silence would not be used against him." *Portuondo v. Agard*, 52 9 U .S. 61, 75 (2000) (emphasis in original ). In *Fletcher v. Weir*, 455 U.S. 603, 606 (1982), the United States Supreme Court held where there has been no governmental action to induce the defendant to remain silent, the *Miranda*-based rationale does not apply. A prosecutor may impeach a defendant's testimony using pre-arrest silence, *Jenkins v. Anderson*, 4 4 7 U.S. 231 , 240 (1908) ,

post-arrest, pre-Miranda warning silence, *Fletcher*, 455 U.S. at 605-606, and any voluntary post-Miranda warning statements. *See Anderson v. Charles*, 447 U.S. 404, 408-409 (1980).

The Court has reviewed the relevant record, including Officer Fortunato's trial testimony and the Prosecutor's summation, and agrees with the Appellate Division reasoning that "[t]he prosecutor's comment was not about defendant's *silence*. In fact, the witness was talking about *events*. There was no post-arrest 'silence' under circumstances where an innocent person would be expected to speak. A prosecutorial comment on silence under those circumstances would have been improper. Here, the comment was *not* on silence, but on defendant's choice of *topics*." (ECF No. 18-20 at 20) (emphasis added). As the Panel noted, consistent with clearly established Supreme Court precedent: "[Petitioner] has a right to remain silent . . . She, however, does not enjoy a right to have her remarks exempt from scrutiny." *Id.* In short, Petitioner's claim fails because she has not, and cannot, point to any federal precedent giving her a constitutionally protected Due Process right that prohibited evidentiary use of her comments on voluntarily-offered comments. Furthermore, the prosecutor's comments as to Petitioner's lack of inquiry about fire victims or damage occurred after she had disappeared from the fire scene and then intentionally returned to voluntarily report disappearance of her pocketbook and hubcaps to Officer Fortunato. (ECF No. 18-90 at 9.) No *Miranda* post-arrest right to silence had yet arisen at this point because no custodial situation existed.

The Court will therefore deny habeas relief as to Ground Three.

## D. Ground Four: Prosecutorial Misconduct

Ground Four of the Amended Petition alleges prosecutorial misconduct and claims "violation of [Petitioner's] constitutional rights to due process and a fair trial by the prosecutor's (a) undermining the right to confront witnesses against [Petitioner] [by] . . . a demonstration for

19

the jury during summation[10] (hereinafter referred to as Petitioner's "Summation Demonstration Claim"), (b) the prosecutor['s] argu[ment] to the jurors . . . they would be violating their oaths if they . . . believed Petitioner purchased the container of gasoline [but] found her not guilty (hereinafter referred to as Petitioner's "Oath Claim"), and (c) improper suggestion to the jury that the defense's expert had colored his testimony because he was being compensated for his services" (hereinafter referred to as Petitioner's "Expert Fee Claim") (the Petitioner's Demonstration Claim, Oath Claim, and Expert Fee Claim hereinafter collectively referred to as Petitioner's "Prosecutorial Misconduct Claims"). (ECF No. 3 at 40.)

Petitioner's Amended Petition bases her Demonstration Claim upon the prosecutor's demonstrative use of a 16-ounce bottle of Snapple to show jurors the quantity of gasoline (roughly nine to seventeen ounces) that Petitioner purchased and possessed just prior to the fire. The assistant prosecutor opened the Snapple bottle and poured its contents onto the courtroom floor and stated the following to the jury:

> The Snapple bottle I just opened is brand new, we heard the pop, is 16 ounces. (Mr. Weis demonstrates by pouring a liquid on the floor.) You think that's a little bit of gas? You think that's a little bit of gas? Maybe if we were just to do that on the floor, which is beyond that, does that look like a little bit more now, by the way, as it's spread out? Do we think that's enough yet? . . . I still got more than half a bottle in here. Amount of gas starting to become effective? Maybe we'll pour some more on it. Let me do it again. Let me just really douse it good. How much more gas do I need? How much more gas do I need to send this 70-year-old building up like kindling wood? How much more? You want more? Because we had more. I'll tell you what, that's probably not even .10 to .15 cents that I used. That's half a bottle, 8 ounces, but we'll throw 8

---

[10] In her Amended Petition, Petitioner contends that she also asserted a *Strickland* claim on PCR because her attorney failed to object to the demonstration. The Court has reviewed Petitioner's briefs on PCR and this issue was not raised as ineffective assistance of counsel. As such, the Court does not consider it further.

more on, if you need to, being soaked into that carpet on top of that
dried wood with the balance of the fuel load there.

(ECF No. 18 at 77 – 78; ECF No. 18-89 at 19 – 21.)

The Appellate Division ruled that the State's summation demonstration was within the

scope of evidence presented at trial and did not violate Petitioner's right to confrontation:

> [T]he demonstration was within the scope of evidence presented at
> trial. One of the main defense strategies at trial was to dispute the
> State's claim that the amount of gasoline allegedly purchased by
> defendant was sufficient to start the fire in question. Hence, the
> defense sought to make the point that the amount of gasoline the
> State claimed cause[d] the fire, nine to seventeen ounces, was a
> small amount of gasoline by referring to the amount as 'one to two
> cups.' During the State's cross-examination of Maglione, the
> prosecutor asked the witness, 'If I were to pour nine ounces of
> gasoline on this courtroom floor in front of you and throw a match
> to it, am I going to have a sound generated from that?' The
> prosecutor's demonstration illustrated the quantity of gasoline in
> the container. Thus, the prosecutor's demonstration was within the
> scope of the evidence in the case and, therefore, not a comment
> upon matters outside the evidence. On the other hand, *State v.
> LiButti*, 146 N.J. Super. 565, 569 (App. Div. 1977) clearly cautions
> that such demonstrations should take place during the course of the
> trial and prior to final argument so as to permit an opportunity for
> cross examination. *Ibid.* That was not done in this case. However,
> *LiButti* does not appear to have adopted a per se rule with respect
> to demonstrations during summation. Defendant could have asked
> the court for the opportunity to make a supplemental closing
> argument in response. Defendant made no such request. Although
> the prosecutor acted improperly in conducting the demonstration
> during summation, and deserves admonishment, defendant's
> constitutional right of confrontation was not denied as a result.
> Defendant presented evidence challenging the State's theory of
> how much gasoline was used to start the fire during trial.

(ECF No. 18-20 at 12-15.)

The Oath Claim is based upon the following statement by the prosecutor in summation:

> If you believe that evidence [that Petitioner purchased 0.10 to 0.15
> cents worth of gasoline] and you find the gas attendants credible,
> there's no reasonable doubt what happened here. This woman got
> enraged. There's provocation in her mind, not reasonable, but in

> her mind someone incensed her. She said she was going to burn
> the fucking place down. C.J. heard her make threats. She went and
> got the gasoline and she burned the place down. And if you don't
> find that testimony to be proof beyond a reasonable doubt, then I
> don't think you're honoring your oath. (ECF No. 18-89 at 49-50.)

The trial court sustained defense counsel's objection. In response to the prosecutor's apology,

the trial court stated "Improper. Improper." (*Id.* at 50.)

The Appellate Division found the prosecutor's comment harmless in light of: (1) the

judge's prompt admonition to the prosecutor; (2) the prosecutor's apology; (3) the court's later

instruction to the jury that comments by the attorneys are not evidence; and (4) the verdict itself,

in which the jury found defendant not guilty of a majority of the counts submitted. (ECF No. 18-

20 at 16.)

Petitioner's Amended Petition bases her Expert Fee Claim upon the prosecutor's cross-

examination questions to the defense's expert regarding his professional fees.

> Q: You're not doing this for free. Correct?
>
> A: No, I'm not.
>
> Q: You're getting paid. Right?
>
> A: I hope so.
>
> Q: How much are you getting paid for this?
>
> A: I have billed and received a total of $7,000-plus.
>
> Q: In excess of $7,000?
>
> A: Yes.
>
> Q: Are you still counting? You made it sound there's more
> to come.
>
> A: I billed for $7,000-plus.
>
> Q: To date?
>
> A: Yes.
>
> Q: I'm asking - Is there more yet to come?
>
> A: For today, yes.
>
> Q: You get compensated for your testimony today, too?

22

A: Yes, I do").

(*See* ECF No. 81-85 at 40.)

Defense counsel did not object to this exchange at trial. When asked on redirect

examination whether the fees he received or anticipated receiving would influence his opinion,

Petitioner's expert unequivocally stated that there was "no amount of money" and "nothing on

earth" that would affect his judgment or opinion. (ECF No. 18-85 at 49.) Upon instructing the

jury on appropriate consideration of expert witness testimony in his general charge, the trial

judge stated:

> In resolving any conflict that may exist in the testimony of expert
> witnesses, you must weigh one expert's opinion against the other,
> and you must consider the reasons given by one, as compared with
> those of the other. And you should consider the relative credibility
> and knowledge of the experts who have testified. Thereupon, you
> should find in favor of that expert's testimony which in your
> opinion is entitled to greater weight. Nevertheless, you must
> always keep in mind the State has the burden of proving the crime
> and each of its elements beyond a reasonable doubt. If you should
> find that a State's expert is more credible than a defendant's
> expert, you must still consider whether the conflict in expert
> testimony may have created reasonable doubt concerning the crime
> or one of its elements. You are instructed that the amount of the
> expert witness's fee is a matter which you may consider as
> possibly affecting credibility, interest, bias or partisanship of the
> witness. However, since all expert witnesses expect to be paid and
> are paid, you are instructed that there's nothing improper in the
> expert witness being paid a reasonable fee for his or her work, for
> his or her time in attending court.

(ECF No. 18-90 at 39 - 40.)

The Appellate Division ruled that the prosecutor's comment regarding defense expert's

professional fee did not warrant relief because the trial court gave "the standard instruction on

fees paid to professionals" and there was "sufficient evidence offered to convict defendant even

if no expert testimony had been offered." (ECF No. 18-20 at 16-17.)

23

In analyzing claims of prosecutorial misconduct, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). The appropriate standard is "the narrow one of due process and not the broad exercise of supervisory power." *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). It is "not enough that the prosecutor's remarks were undesirable or even universally condemned." Remarks by the prosecutor must be placed in context, and evaluated in light of the defense arguments that preceded it. *Id.* at 179-181. The severity of the prosecutor's actions, the effect of any curative instructions and the evidence against the defendant should be considered. *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir.2001). "[T]he stronger the evidence against the defendant, the more likely that improper arguments or conduct have not rendered the trial unfair." *Marshall v. Hendricks*, 307 F.3d 36, 69 (3d Cir. 2002).

This Court has carefully reviewed the state court transcripts of the prosecutor's summation and cross-examination. Having considered Petitioner's arguments on prosecutorial misconduct, this Court finds no basis to grant habeas relief. The prosecutor's comments during the cross-examination of Petitioner and in closing argument did not so infect the trial with unfairness so as to make the resulting conviction a denial of due process. *See Gooding v. Wynder*, 459 F. App'x. 83, 85–86 (3d Cir. 2012) (concerning prosecutor's comments at various stages of trial). The Court will deny habeas relief on Ground Four.

### E. Ground Five: Trial Court Evidentiary Rulings

In Ground Five (ECF No. 3 at 41-42), Petitioner challenges (1) the State's presentation of trial testimony she had stolen $250 from her landlord Arawattie Ramnanana's purse and had cut

24

the wires to the landlord's washing machine; (2) the State's presentation of two witnesses' testimony that, prior to the fire, Petitioner had threatened to burn down the apartment house; (3) the trial court's exclusion of defense witness testimony that she had not stolen the $250 and that the landlord had confrontations with many neighbors other than Petitioner; and (4) the trial judge's exclusion on hearsay grounds of testimony regarding the landlord's threats directed at Petitioner. (ECF No. 3 at 41 - 42.)

On direct appeal, Petitioner argued that the trial court had unconstitutionally precluded her from presenting evidence in her defense to rebut the State's evidence about the $250 theft, the removal of the oven from Petitioner's apartment, and the cut washing machine wires. (ECF No. 18-20 at 20 - 21; ECF No. 18-17 at 59 – 60; ECF No. 18-18 at 1 - 8.)

The Appellate Division "carefully considered" these contentions and

> conclude[d] that they are without merit and do not warrant discussion in a written opinion. *R.* 2:11-3(e)(2). We merely note that the testimony by defendant's mother regarding an alleged threat by the landlord's brother-in-law is hearsay and inadmissible. Moreover, testimony from other neighbors that Arawattie frequently called the police was properly excluded by the judge. Such evidence was irrelevant to the issues at trial.

(ECF No. 18-20 at 21.)

To the extent it was raised as a federal claim, Ground Five fails to demonstrate a constitutional violation of fundamental unfairness at trial.[11] Federal courts' habeas powers do not permit reversal of convictions based on a belief that a trial judge incorrectly interpreted a state evidentiary rule. That is, an erroneous evidentiary ruling is not itself grounds for habeas relief. To rise to the level of a constitutional violation, a state court's evidentiary decision must have

---

[11] Even if Petitioner did not fairly present this issue to the state courts as a federal claim, this Court may deny the claim on the merits. *See Taylor*, 504 F.3d at 427.

25

been so arbitrary or prejudicial that it rendered the trial fundamentally unfair, thereby violating a petitioner's Due Process rights. *See Romano v. Oklahoma*, 512 U.S. 1, 12–13 (1994); *see also Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001) (evidentiary error rises to the level of a Due Process violation only when "it was of such magnitude as to undermine the fundamental fairness of the entire trial"). The category of infractions that violate 'fundamental fairness' is "very narrow[]." *Dowling v. United States*, 493 U.S. 342, 352 (1990). Petitioner cites no federal precedent that constitutionally entitles her to present the evidence excluded by the trial judge, and she points to no defense under federal law that she was deprived of by the state court's evidentiary rulings. *Johnson*, 117 F.3d at 110.

Furthermore, Ground Five fails under state law. Given that the proposed testimony of Petitioner's mother (Louvenia Stone) regarding an out-of-court statement she attributed to Krishna Ramnanana's brother-in-law (Arawattie Ramnanana) was offered at trial to show Petitioner's state of mind (and not to establish third-party guilt, as Petitioner subsequently suggested on direct appeal), New Jersey Rule of Evidence 404(b) allowed exclusion of the challenged evidence. Petitioner sought to introduce her mother's hearsay testimony to attack the character of Arawattie Ramnanana, and *not* for the truth of the matter asserted – *i.e.*, Mr. Ramnanana's threat towards Petitioner. The Appellate Division's ruling determined that the trial court was correct to exclude such evidence under N.J.R.E. 404(b).

For the reasons explained above, the Court will deny habeas relief as to Ground Five.

## F. Ground Six: Jury Instructions

In Ground Six, Petitioner alleges trial court errors in charging the jury. She alleges that the trial court erred in (1) refusing Petitioner's request to have the jury charged in criminal mischief as a lesser charge to arson (Petitioner's "Lesser Charge Claim"); (2) refusing to charge

26

the jury on causation as it related to the manslaughter counts (Petitioner's "Manslaughter Charge Claim"); and (3) ruling that causation was not an issue in the case, and thereby precluding counsel from arguing causation in summations (Petitioner's "Causation Claim")." (ECF No. 3 at 43.) For the reasons explained in this section, the court will deny habeas relief as to Ground Six.

The United States Supreme Court and Third Circuit have made clear that it is not the role of the federal courts to review state court jury instruction rulings that are based on state law. Rather, federal courts' "task is to determine whether [a petitioner] 'is in custody in violation of the Constitution or laws or treaties of the United States.'" *Barkley v. Ortiz*, 209 F. App'x 120, 124 (3d Cir. 2006) (rejecting claim based on the failure to charge accomplice liability which was rooted in violations of state law) (quoting 28 U.S.C. § 2254); *see also Estelle v. McGuire*, 502 U.S. 62, 67 - 68 (1991) ("[I]t is not the province of a federal habeas court to re-examine state court determinations on state-law questions."). Habeas petitions alleging specific errors in state law stemming from improprieties during the state trial fail, unless the error is of constitutional magnitude: *i.e.*, the error resulted in a fundamentally unfair proceeding and thereby violated a petitioner's Due Process rights.

Consistent with this clearly established federal law, questions relating to jury charges are normally matters of state law and procedure, and they do not constitute claims for federal habeas review. It is well-established that "a state court's misapplication of its own law does not generally raise a constitutional claim. The federal courts have no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Smith v. Horn*, 120 F.3d 400, 414 (3d Cir.1997) (citations omitted), *cert. denied*, 522 U.S. 1109 (1998). *See Engle v. Isaac*, 456 U.S. 107 (1982); *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 309 (3d Cir.), *cert. denied*, 502 U.S. 902 (1991); *Grecco v. O'Lone*, 661 F. Supp. 408, 412 (D.N.J. 1987).

"[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle*, 502 U.S. at 71 - 72. Rather, the habeas court must consider "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process [under the Fourteenth Amendment],' . . . not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146 - 47 (1973)). A state trial court's refusal to give a requested jury instruction does not, by itself, create a federal habeas corpus claim. A habeas petitioner must establish that the instructional error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The error must have resulted in "actual prejudice." *Id.* at 637.

It is "well established" that the instruction "may not be judged in artificial isolation," but must be viewed in the context of the overall charge and the trial record. *Cupp v. Naughton*, 414 U.S. 141, 146 (1973); *Rompilla v. Horn*, 355 F.3d 233 (3d Cir. 2004). Further, "in reviewing an ambiguous instruction . . ., [the court should] inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle*, 502 U.S. at 72 (citations omitted); *see also Smith v. Spisak*, 558 U.S. 139, 149 (2010) (overruling Court of Appeals determination that jury instruction was unconstitutional where such determination had not previously been made by the Supreme Court); *Waddington v. Sarausad*, 555 U.S. 179 (2009). The United States Court of Appeals for the Third Circuit has observed that a habeas petitioner who challenges state jury instructions must "point to a federal requirement that jury instructions . . . must include particular provisions," or demonstrate that the jury "instructions deprived him of a defense which federal law provided to him." *Johnson v. Rosemeyer*, 117 F.3d 104, 111 (3d Cir. 1997). This is because district courts do not "sit as super

28

state supreme courts for the purpose of determining whether jury instructions were correct under state law with respect to the elements of an offense and defenses to it." *Id.* at 110. *See Smith v. Horn*, 120 F.3d 400, 416 (3d Cir. 1997), *cert. denied*, 522 U.S. 1109 (1998) (the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law"); *Herrill v. Ricci*, No. CV 10-3575, 2016 WL 1183176, at *11–12 (D.N.J. Mar. 28, 2016), certificate of appealability denied (July 29, 2016).

### 1. Petitioner's Lesser Charge Claim

At the charging conference, defense counsel requested a jury instruction on criminal mischief as a lesser included offense of third degree arson. (ECF No. 18-18 at 11.) The trial court declined to give the charge (ECF No. 18-88 at 3) and instead gave the following extensive jury instruction as to the elements of aggravated arson under N.J.S.A. 2C:17-1:

> A person is guilty of aggravated arson if he or she starts a fire or causes an explosion, whether on his property or another's, thereby purposely and knowingly placing another in danger of death or bodily injury or with the purpose of destroying a building or structure of another or with the purpose of collecting insurance. In order for the defendant to be guilty of aggravated arson, the state must prove the following elements beyond a reasonable doubt: One, that the defendant started a fire at or near the premises known as 208 Belvidere Avenue . . . The state must then prove that at the time the defendant started the fire, she purposely or knowingly placed another person in danger of death or serious bodily injury . . . . If the state has failed to prove any one or more of these elements, you must find the defendant not guilty of aggravated arson. If the state has proven each element beyond a reasonable doubt, you should find the defendant guilty of the crime of aggravated arson.

(ECF No. 18-90 at 54-56.)

Petitioner relies on her briefs submitted in support of her "direct appeal . . . [and] PCR" briefs (ECF No. 3 at 43), the former of which asserted the Lesser Charge contention as a state

law claim.[12] (ECF No. 18-18 at 13 - 18) (arguing that "even if criminal mischief is not strictly a lesser-included offense of arson, there is still a rational basis on which the jury could have acquitted defendant of arson, but convicted her of criminal mischief") (internal citations to New Jersey cases omitted). The Lesser Charge Claim was not asserted as, nor could it succeed as, a federal claim.

In *Beck v. Alabama*, 447 U.S. at 627, the Supreme Court held that the death penalty may not be imposed "when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." *See also Hopper v. Evans*, 456 U.S. 605, 611 (1982) (holding that Due Process does not require lesser included offense instruction in death penalty case where there is no lesser included offense under state law). The Court left open the question of whether instructions on lesser included offenses were required in non-capital cases. *Id.* The Third Circuit has held that trial courts must, when requested, charge a lesser included offense so that the jury does not convict a defendant of a crime more serious than the jury believes the defendant actually committed merely because the jury believes the defendant had some degree of involvement and does not want to set the defendant free. *See Vujosevic v. Rafferty*, 844 F.2d 1023, 1027 (3d Cir. 1988) (citing *Keeble v. United States*, 412 U.S. 205, 212–13 (1973)). *But see Geschwendt v. Ryan*, 967 F.2d 877, 884 n.13 (3d Cir.) (observing that the Supreme Court, in *Schad v. Arizona*, 501 U.S. 624 (1991), cast doubt on the theory that Due Process always requires the court to instruct on a lesser included offense in non-capital offenses by applying a harmless-error standard; conviction of an offense two rungs higher up the ladder is a reliable indicator that a jury would not have convicted of the

---

[12] Petitioner did not assert a PCR claim on the Lesser Charge issue. (ECF No. 18-22 at 6-8; ECF No. 18-20 at 21.)

least included offense that was not charged), *cert. denied*, 506 U.S. 977 (1992); [13] *see also Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("Outside of the capital context, we have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error."). Other circuits have held that the failure to give lesser included offense instructions in a non-capital case does not present a constitutional question. *See Johnson v. Keith*, 726 F.3d 1134, 1135 n. 2 (10th Cir. 2013) ("[N]either this court nor the Supreme Court has recognized a federal constitutional right to a lesser included instruction in non-capital cases."); *Carney v. Fabian*, 487 F.3d 1094, 1098 (8th Cir. 2007) ("Because [t]he Supreme Court has never held that due process requires the giving of lesser-included-offense instructions in noncapital cases, the trial court's refusal to give the heat-of-passion manslaughter instruction here cannot be contrary to clearly established federal law") (internal citation and quotation marks omitted).

Accordingly, the Lesser Charge Claim fails because: (1) its contentions were raised as a state law (not federal law) claim. Even if Petitioner had raised the Claim under federal law, it still fails because the trial court's refusal to charge criminal mischief was not contrary to, or an unreasonable application of clearly established Supreme Court precedent.

### 2. Petitioner's Manslaughter Charge Claim

---

[13] After the Court of Appeals decided *Vujosevic*, the United States Supreme Court rendered its decision in *Schad v. Arizona*, 501 U.S. 624 (1991). In *Schad*, Petitioner was tried for capital offenses, and in accordance with *Beck*, the jury was given the option of finding Petitioner guilty of the noncapital offense of second-degree murder. *See id.* at 645-46. However, Petitioner argued that the trial court should have charged the jury on every lesser included noncapital offense supported by the evidence, in his case, robbery. *See id.* at 646. The Supreme Court disagreed, stating that "the central concern of *Beck* simply is not implicated in the present case, for petitioner's jury was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence." *Id.* at 647. In *Schad's* case, the jury was given a choice of capital murder and second-degree murder, and the Supreme Court was "satisfied that the second-degree murder instruction ... sufficed to ensure the verdict's reliability." *Id.* at 647-48.

At the charging conference (ECF No. 18-87 at 34 - 41), defense counsel requested that the reckless manslaughter jury instruction include remote causation language from New Jersey's Model Criminal Jury Charges (N.J.S.A. 2C:2-3), as derived from *State v. Martin*, 119 N.J. 2, 32 (1990).[14] Based on the evidence, the trial judge declined the request: "[B]ased upon the testimony that I heard from the fire experts, I am satisfied that it [cause and result] is not an issue, the causal relationship between the conduct and the result. I don't know of an intervening cause. The testimony I think we all agree, all of the experts agree that the chimney effect would have certainly had an effect upon the fire, but that's not what the real cause was. The cause was the gasoline. I am finding there is not any issue about a causal relationship between the conduct and the result." (ECF No. 18-87 at 41 - 42)

Instead, the trial court gave the following reckless manslaughter jury instruction:

> A person is guilty of reckless manslaughter if he or she recklessly causes the death of another person. In order for you to find the defendant guilty of reckless manslaughter, the state is required to prove each of the following elements beyond a reasonable doubt: One, that the defendant caused the death of these three victims; two, that the defendant did so recklessly . . . [T]he state must prove beyond a reasonable doubt that the defendant caused the death of the three victims. You must find that the three victims would not have died but for the defendant's conduct.

(ECF No. 18-90 at 53 - 54.)

---

[14] "We note the absence from the Model Criminal Jury Charges of a specific charge on causation in the felony-murder context. Although we cannot provide in this opinion a single charge suitable for all cases, we offer the following summary as a guide for trial courts. The court should instruct the jury that the defendant, whether a sole perpetrator or an accomplice, is liable for felony murder only if the death is not too remote, accidental in its occurrence, or too dependent on another's volitional act to have a just bearing on the defendant's culpability." *State v. Martin*, 119 N.J. 2, 32 (1990).

The trial court did, however, give the full version of the *Martin* remote causation

instruction in its felony murder jury charge:

> In order for you to find the defendant guilty of felony murder, the
> state is required to prove beyond a reasonable doubt from all the
> evidence in the case all of the essential elements of the crimes
> charged. Accordingly, before you could find the defendant guilty
> of felony murder, the state must prove beyond a reasonable doubt:
> One, that on or about May 30, 1997, the defendant was engaged in
> the commission of or attempt to commit or a flight after
> committing or attempting to commit the crime of arson as charged
> in these three counts; second, that the death of these three victims
> was caused by the defendant; third, that the death of the three
> victims was caused at some time within the course of the
> commission of those crimes or that crime relating only to arson,
> including its aftermath of flight and concealment efforts; and,
> fourth, and finally, that the three victims were not participants in
> the arson . . . The second and third elements require the state to
> establish that the victim's death was caused by the defendant, it
> was caused during the commission of or attempting to commit the
> crime of arson. In order to meet its burden of proof as to the
> second and third elements, the state must prove beyond a
> reasonable doubt that, but for the defendant's conduct in the
> commission of or flight after committing or attempting to commit
> arson, the victims would not have died, in other words, that the
> victims' death would not have occurred without the commission of
> the arson; two, that the victims' death, that is, the death of the three
> victims, was a probable consequence of the commission of the
> crime of arson. *In order for a death to be a probable consequence*
> *of the arson, the death must not have been too remote or too*
> *accidental in its occurrence or too dependent on another's*
> *volitional acts to have a just bearing on the defendant's liability or*
> *the gravity of her offense. In other words, you must decide if the*
> *state has proven beyond a reasonable doubt that, under all of the*
> *circumstances, the death did not occur in such an unexpected or*
> *unusual manner that it would be unjust to find the defendant*
> *responsible for the death.*

(ECF No. 18-18 at 21 - 22; ECF No. 18-90 at 57 - 60; ECF No. 18-91 at 1 - 2) (emphasis added).

At the close of trial, the jury acquitted Petitioner of purposeful or knowing murder and

the lesser-included offenses of aggravated manslaughter and passion-provocation manslaughter.

33

The jury found her guilty of three counts of felony murder and three counts of reckless manslaughter. (ECF No. 18-94 at 5-16; ECF No. 18-95 at 57.)

On direct appeal, Petitioner argued (ECF No. 18-18 at 18-21) that the trial court erred by refusing to incorporate *Martin*'s Model Jury Charge remote causation language into the reckless manslaughter instruction. Petitioner, while contending that "causation was very much at issue . . . in this case," did acknowledge that the trial court had given the full causation instruction in the felony murder charge. (ECF No. 18-18 at 21-22.) The Appellate Division found that the jury charge issues as a whole were "without merit and do not warrant discussion in a written opinion." (ECF No. 18-20 at 21.) On habeas, Petitioner's Manslaughter Charge Claim in Ground Six alleges deprivation of "due process rights to a fair trial by multiple erroneous jury instructions for . . . refusing to charge on causation as it related to the manslaughter counts." (ECF No. 3 at 43.)

Petitioner relies on her briefs submitted in support of her direct appeal briefs (ECF No. 3 at 43), which raised the Manslaughter Charge contention as a state law claim. (ECF No. 18-18 at 18-21) (citing state law cases addressing causation instructions) (internal citations to New Jersey cases omitted).

With respect to erroneous jury instructions, the Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law." *Smith v. Horn*, 120 F.3d 400, 416 (1997); *see In re Winship*, 397 U.S. 358, 364 (1970) (holding due process requires proof beyond reasonable doubt of each fact necessary to constitute crime with which defendant is charged); *Sandstrom v. Montana*, 442 U.S. 510, 523 (1979) (finding jury instruction suggesting that jury may convict without proving each element of crime beyond reasonable doubt violates constitutional rights).

34

Similarly, where a jury instruction operates to "remove from the jury's consideration a necessary element of the prosecutor's case", the Sixth Amendment right to trial by jury is implicated. *See, e.g., Gonzalez v. Wolfe*, 290 F. App'x 799, 811–12 (6th Cir. 2008).

Here, the reckless manslaughter instruction was not contrary to, or an unreasonable application of Supreme Court precedent because the Court has never held that the Due Process Clause guarantees the right of a defendant to have the jury instructed on remote causation. Petitioner has pointed to no "federal requirement that jury instructions on the elements of [the reckless manslaughter] offense . . . must include particular [remote causation] provisions." *Johnson*, 117 F.3d at 110.

Furthermore, the reckless manslaughter conviction was merged into the felony murder conviction, which included remote causation instructions. Any error with respect to Petitioner's Manslaughter Charge Claim appears harmless because the jury did, in fact, render a remote causation determination; it did so as to felony murder. Having been instructed by the trial judge on remote causation as to felony murder (ECF No. 18-99 at 60; ECF No. 18-91 at 1), the jury's conviction of Petitioner for that crime reflected its determination that "the death [was] not too remote or too accidental in its occurrence or too dependent on another's volitional acts." (ECF No. 18-91 at 1.) The three deaths at issue for the reckless manslaughter crime were the same three deaths for the felony murder crime. The jury's finding that those deaths were a probable consequence of the fire is not altered by the name of the crime; so the trial court's decision to give a remote causation provision in one charge and not another was inconsequential in these circumstances under these facts. *See Middleton v. McNeil*, 541 U.S. 433, 437 (2004) ("a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge") (internal quotations and citations omitted). Because Petitioner has not shown

35

that the reckless manslaughter charge was fundamentally unfair or that the charge violated Due Process of the U.S. Constitution, the Court will deny habeas relief as to Petitioner's Remote Causation Claim.

### 3. Petitioner's Causation Claim

At the charging conference, the trial court determined that causation was not an issue in the case: "[B]ased upon the testimony that I heard from the fire experts, I am satisfied that it [the matter of cause and result] is not an issue, the causal relationship between the conduct and the result. I don't know of an intervening cause. The testimony I think we all agree, all of the experts agree that the chimney effect would have certainly had an effect upon the fire, but that's not what the real cause was. The cause was the gasoline. I am finding there is not any issue about a causal relationship between the conduct and the result." (ECF No. 18-87 at 41 - 42) ("No-Causation Ruling").

On direct appeal, Petitioner argued that this ruling violated her "right to a fair trial" by "precluding defense counsel from arguing it [causation] in summation." (ECF No. 18-17 at 3.) Her direct appeal brief stated that her counsel's summation "did not mention their alternate defense – that even if she did start the fire, defendant intended only to cause a minor annoyance, not to destroy the building." (ECF No. 18-18 at 24.) The Appellate Division "carefully considered th[is] contention and conclude[d] [it was] without merit and d[id] not warrant discussion in a written opinion." (ECF No. 18-20 at 21.)

The Appellate Division's decision was not contrary to, or an unreasonable application of U.S. Supreme Court precedent. The Supreme Court has never held that the Due Process Clause guarantees the right of a criminal defendant to argue causation in summations. Thus, Petitioner's Causation Claim raises no federal law issue. Petitioner cites no federal requirement that

36

constitutionally entitles her to present the particular summation topic of causation, and she points

to no defense under federal law that she was deprived of by the No-Causation Ruling. *Johnson*,

117 F.3d at 110. The Appellate Division's rejection of Petitioner's claim was consistent with

clearly established federal law, under which "[t]he conduct of the trial, including closing

arguments, is regulated under the sound discretion of the trial judge." *Moore v. Morton*, 255 F.3d

95, 105 (3d Cir. 2001) (citing *Herring v. New York*, 422 U.S. 853, 861 (1975) ("[t]he presiding

judge must be and is given great latitude in controlling the duration and limiting the scope of

closing summations . . . [H]e must have broad discretion")).

      This claim also fails because she has not demonstrated that exclusion of causation from

summation resulted in a fundamentally unfair proceeding that violated her Due Process rights.

Given Petitioner's defense at trial of complete denial of any guilt (ECF No. 18-18 at 9),

exclusion of causation from summation cannot be said to have "offend[ed] some principle of

justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, or

transgress[ed] any recognized principle of fundamental fairness in operation." *Patterson v. New

York*, 432 U.S. 197, 201-02 (1977). Had her counsel argued causation in closing statements,

Petitioner would have had to jettison her denial defense and concede that she set the fire. Her

causation contention on habeas, then, is internally inconsistent with the record below. Moreover,

the trial judge exercised his discretion to exclude causation issues in the context of evidence

where both sides' expert witnesses concluded that the fire had been deliberately set and that

gasoline was used by the perpetrator to cause the blaze.

## G. Procedurally Defaulted Claims – Direct Claims Asserted in Grounds Seven, Eight, & Nine

      Petitioner did not raise her *Miranda* (Ground Nine) or Identification (Grounds Seven &

Eight) Claims on direct appeal. Instead, she raised them for the first time in her PCR and also

37

alleged that her appellate attorney was ineffective for failing to raise these claims on direct

appeal. (*See* ECF No. 18-23 at 39-49, 60-78, 120-123.) In the Opinion denying Petitioner's first

PCR, the court found that (1) the direct *Miranda* and Identification Claims were procedurally

barred under New Jersey Court Rule 3:22-4 and that (2) Petitioner's appellate attorney did not

provide ineffective assistance of counsel by failing to raise these claims on direct appeal. (*See*

ECF No. 18-30.)

On appeal of the denial of her PCR, the Appellate Division affirmed the PCR court's

rejection of the Miranda and Identification Claims as follows:

> Point V, the trial court's refusal to suppress five statements made
> by defendant to the police, was an issue that could have been
> raised on a cross-appeal to the leave we granted to the State for an
> interlocutory appeal after a *Miranda* hearing. The judge conducted
> an evidentiary hearing to determine the admissibility of nine
> statements defendant gave to the police. The judge excluded four
> of the nine statements and the State sought leave to appeal, which
> we granted. We specifically noted that defendant did not cross-
> appeal with respect to the five statements the judge determined
> were admissible. The State was concerned about only the two
> suppressed statements by defendant respecting why the police K-
> units might detect gasoline in her car. We affirmed the exclusion of
> this evidence. The issue of the other five statements could also
> have been raised on the direct appeal.
>
> As the PCR judge correctly found, the other issues that could have
> been raised on direct appeal were: (1) Point IV, the indictment
> should have been dismissed; (2) Point VI, the State's 404(B)
> evidence should not have been admitted into evidence; (3) Point
> VII, the identifications made by Barra and Zafar should not have
> been admitted into evidence; (4) Point VIII, the gruesome
> photographs of the victims should not have been admitted into
> evidence; (5) Point IX, the trial court erred in giving a jury charge
> on flight and using a verdict sheet instructing the jurors to consider
> reckless murder before felony murder; (6) Point XI, the trial court
> extensively limited relevant and proper cross-examination; and (7)
> Point XII, miscellaneous errors, including (a) it was improper for
> the prosecutor to state that a videotape existed of defendant buying
> gasoline (no record citation and presumably a statement made to
> defendant during police interrogation), (b) a sentence should have

38

> been imposed on the reckless manslaughter convictions not the
> felony murder convictions and (c) the trial court erred in permitting
> a superseding indictment.
>
> The PCR judge correctly concluded that all of these issues either
> were or could have been reasonably asserted in the prior
> proceedings. Defendant has wholly failed to demonstrate that
> enforcing the bars of R. 3:22-4 and R. 3:22-5 would result in any
> fundamental injustice. She has also completely failed to establish
> that denial of relief on any of these grounds would be contrary to
> the Constitutions of the United States or New Jersey.

*Stone*, 2008 WL 539254 at \*3-4. Although the Appellate Division found that her direct Miranda

and Identification Claims were barred on PCR, the Court went on to address whether Petitioner

had alleged claims of ineffective assistance of appellate counsel based on these same claims:

> The foregoing conclusions do not preclude consideration of
> whether either or both counsel were ineffective.
>
> . . . .
>
> Regarding the five statements made by defendant that were
> admitted into evidence (Point V), the judge concluded that
> appellate counsel's decision not to appeal the admission of this
> evidence did not rise to constitutional ineffective assistance of
> counsel in light of the overwhelming evidence of defendant's guilt,
> which made proof of the second *Strickland* prong impossible.
>
> . . . .
>
> As to the admission of the identifications by Barra and Zafar (Point
> VII), the judge observed that the witnesses identified defendant
> from a six-photo array, the trial judge conducted a *Wade* hearing
> and admitted the evidence and no serious error could be found in
> appellate counsel's failure to raise this issue because our Supreme
> Court has held that a trial court's ruling should not be disturbed if
> it could reasonably have been reached on the evidence, citing *State
> v. Ford*, 79 N.J. 136, 398 A.2d 95 (1979).

*Id.* at \*4. The Appellate Division then affirmed the denial of PCR for the reasons expressed by

the PCR Court:

> We affirm substantially for the reasons expressed by Judge
> Vazquez in his oral and written opinions delivered on March 30,
> 2006. The findings and conclusions of the judge are supported by
> substantial, credible evidence in the record. *State v. Locurto*, 157

> N.J. 463, 471, 724 A.2d 234 (1999). We add only that an appellate
> attorney is not required to advance every argument that the
> defendant urges, even if the argument is not frivolous. *Jones v.
> Barnes*, 463 U.S. 745, 103 S.Ct. 3088, 77 L. Ed.2d 987 (1983).
> "Experienced advocates since time beyond memory have
> emphasized the importance of winnowing out weaker arguments
> on appeal and focusing on one central issue if possible, or at most
> on a few key issues." *Id.* at 751-52, 103 S.Ct. 3313, 77 L. Ed.2d at
> 994. That is precisely what appellate counsel did here and, having
> done so, secured a very significant reduction in the minimum time
> to be served. Appellate counsel's decision to exclude the six issues
> advanced here by defendant was not a serious error and
> consideration of these issues would not have resulted in a remand
> for a new trial.

*Id.* at \*6.

In her Amended Petition, Petitioner asserts the Direct Miranda claim in Ground Nine and

her Identification Claim in Ground Seven and Eight.[15] Because the Appellate Division barred the

Direct Miranda and Identification claims under N.J. Ct. Rule 3:22-3, these claims are barred by

the doctrine of procedural default unless Petitioner can establish cause and actual prejudice <u>or</u>

fundamental injustice.

As the United States Court of Appeals for the Third Circuit explained in *Rolan v.*

*Coleman*:

> Procedural default occurs when a claim has not been fairly
> presented to the state courts (i.e., is unexhausted) and there are no
> additional state remedies available to pursue, *see Wenger v. Frank*,
> 266 F.3d 218, 223-24 (3d Cir. 2001); or when an issue is properly
> asserted in the state system but not addressed on the merits because
> of an independent and adequate state procedural rule, *see
> McCandless v. Vaughn*, 172 F.3d 255, 260 (3d Cir. 1999).

---

[15] In her Amended Petition, Petitioner does not explicitly raise ineffective assistance of appellate counsel for failing to raise the *Miranda* and Identification Claims on direct appeal. The *Miranda* and Identification claims would also fail under *Strickland* because Petitioner is unable to establish that she was prejudiced by her appellate counsel's failure to raise these issues on direct appeal.

*Rolan*, 680 F.3d 311, 317 (3d Cir. 2012). With respect to the latter type of procedural default, federal courts are prohibited "from reviewing a state court decision involving a federal question if the state court decision is based on a rule of state law that is independent of the federal question and adequate to support the judgment." *Bey v. Superintendent Greene SCI*, 856 F.3d 230, 236 (3d Cir. 2017) (quoting *Fahy v. Horn*, 516 F.3d 169, 187 (3d Cir. 2008)). Procedural default occurs when "a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Id.* (quoting *Coleman v. Thompson*, 501 U.S. 722, 730 (1991)). The doctrine applies whether the default occurred at trial, on appeal, or during collateral proceedings. *Edward v. Carpenter*, 529 U.S. 446, 451 (2000). "For a federal habeas claim to be barred by procedural default, however, the state rule must have been announced prior to its application in the petitioner's case and must have been 'firmly established and regularly followed.'" *Bey*, 856 F.3d at 236 (quoting *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991)); *see also Lee v. Kemna*, 534 U.S. 362, 376 (2002) ("Ordinarily, violation of 'firmly established and regularly followed' state rules ... will be adequate to foreclose review of a federal claim."). Generally speaking, "[a] state court's refusal to address a prisoner's federal claims because he has not met a state procedural requirement is both independent and adequate." *Cabrera v. Barbo*, 175 F.3d 307, 312 (3d Cir.1999) (citations omitted).

The state procedural rule at issue here is N.J. Ct. R. 3:22-4, which provides: "Any ground for relief not raised in a prior proceeding under this rule, or in the proceedings resulting in the conviction, ... or in any appeal taken in any such proceedings is barred from assertion in a proceeding under this rule unless the court on motion or at the hearing finds (a) that the ground for relief not previously asserted could not reasonably have been raised in any prior proceeding;

or (b) that enforcement of the bar would result in fundamental injustice; or (c) that denial of relief would be contrary to the Constitution of the United States or the State of New Jersey."

Petitioner does not contend that Rule 3:22-4 is anything but "firmly established and regularly followed state practice," and case law suggests that the rule is firmly established and regularly followed, the notable exception involving claims of ineffective assistance of counsel. *See Washington v. Ricci*, No. CIV.A.07-1405(JAG), 2008 WL 2945963, at \*8 (D.N.J. July 28, 2008) (explaining same) (citing *Cabrero v. Barbo*, 175 F.3d 307, 312-14 (3d Cir.1999)). Thus, the Court finds that the state courts denied relief on Petitioner's direct *Miranda* and Identification claims based on an adequate and independent state law ground.

A petitioner whose constitutional claims have not been addressed on the merits due to procedural default can overcome the default, thereby allowing federal court review, if she can demonstrate cause for the default and actual prejudice. *See Coleman*, 501 U.S. at 750; *Martinez v. Ryan*, — U.S. ___, 132 S. Ct. 1309 (2012). Alternatively, a petitioner may overcome procedural default by demonstrating that failing to allow her claims to proceed would result in a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 320-22 (1995). Lastly, if a petitioner has committed a procedural default and has not shown either cause and prejudice or a miscarriage of justice, the proper disposition is to dismiss the procedurally defaulted claim with prejudice. *See, e.g., Wainwright v. Sykes*, 433 U.S. 72 (1977).

There is no question that this case is not the type of extraordinary case in which Petitioner can overcome the default of her claims by way of the miscarriage of justice exception. To show a fundamental miscarriage of justice, a petitioner must demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup*, 513 U.S. at 321 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). Under this standard, a petitioner must

42

"support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence— that was not presented at trial." *Schlup*, 513 U.S. at 324. Once such evidence is presented, a petitioner must then show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327. As explained earlier in this Opinion, the Court has already determined that Petitioner's claim of newly discovered evidence in Ground One, *i.e.*, the Printout, does not meet the standard for a gateway claim under *Schlup*, 513 U.S. at 327–29, which requires a showing "that it is more likely than not that no reasonable juror would have convicted [the petitioner] in the light of the new evidence[.]"

Nor has Petitioner provided in her Amended Petition any <u>facts or arguments</u> demonstrating cause and actual prejudice. The only explanation for her failure to raise the Miranda and Identification Claims on direct appeal is her allegation of ineffective assistance of appellate counsel. It is well established that "[a]ttorney error short of ineffective assistance of counsel does not constitute cause for a procedural default even when that default occurs on appeal rather than at trial. To the contrary, cause for a procedural default on appeal ordinarily requires a showing of some external impediment preventing counsel from constructing or raising the claim." *Murray*, 477 U.S. at 492; *see also Coleman*, 501 U.S. at 752 ("So long as a defendant is represented by counsel whose performance is not constitutionally ineffective under the standard established in *Strickland* . . . , we discern no inequity in requiring him to bear the risk of attorney error that results in a procedural default.")(citing *Murray*, 477 U.S., at 488), *holding modified by Martinez v. Ryan*, 566 U.S. 1 (2012). To establish "actual prejudice," a petitioner must prove "'not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of

constitutional dimension.'" *Murray*, 477 U.S. at 494 (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)); *Washington v. Ricci*, No. CIV.A.07-1405(JAG), 2008 WL 2945963, at *8 (D.N.J. July 28, 2008) (explaining same). As explained below, Petitioner is unable to overcome procedural default on her direct Miranda and Identification claims because she is unable to show cause and actual prejudice with respect to either claim.

### 1. Grounds Seven & Eight – Identification Claim

In Grounds Seven and Eight, Petitioner alleges that she was denied her federal due process right to a fair trial when the trial court admitted testimony concerning the identification of her by Mohammed Zafar ("Zafar") and Gregorio Barra ("Barra") (collectively, "Witnesses"), who were employees at the Exxon station where she purchased gasoline prior to the fire at issue.[16] Before trial, Petitioner had moved to suppress these Witnesses identifications, arguing they were inadmissible because: (1) the one-on-one show up in which Barra identified Petitioner was improper, (2) the police improperly interviewed the Witnesses together, (3) there were procedural issues with the administration and composition of the photo array, and (4) the identification made by Zafar resulted from "unconscious transference." (ECF No. 18-10 at 8-12; ECF No. 18-11 at 2-7; ECF No. 18-12 at 2.)

The trial court held a four-day *Wade* hearing to determine the admissibility of the identifications. (ECF No. 18-12 at 1.) In a thorough written opinion, the trial judge ruled, based on the *Wade* hearing testimony, that "the out-of-court, as well as the in-court identifications of

---

[16] Grounds Seven and Eight raise identical issues and are considered together. (ECF No. 3 at 43-44.)

Defendant made by Zafar and Barra are admissible. As such, the State may introduce evidence pertaining to said identifications at trial." (ECF No. 18-12 at 13-14.)

As explained below, the trial court did not violate federal law in admitting the challenged identifications. The Supreme Court has observed that improper pretrial identification procedures by police may cause witnesses to misidentify a criminal. *See Simmons v. United States*, 390 U.S. 377, 383 (1968). An identification procedure may be deemed unduly and unnecessarily suggestive if it is based on police procedures that create "a very substantial likelihood of irreparable misidentification." *Id.* at 384. In such situation, "the witness thereafter is apt to retain in his memory the image of the [misidentification] rather than that of the person actually seen, reducing the trustworthiness of subsequent line-up or courtroom identification." *Id.* at 383–84. "It is the likelihood of misidentification which violates a defendant's right to due process . . . Suggestive confrontations are disapproved because they increase the likelihood of misidentification." *Neil v. Biggers*, 409 U.S. 188, 198 (1972).

Nevertheless, even if an identification procedure is unnecessarily suggestive, the Supreme Court has held that admission of the suggestive identification does not violate Due Process so long as the identification possesses sufficient aspects of reliability. *Manson v. Brathwaite*, 432 U.S. 98, 106 (1977). Reliability, remarked the Court, is the "linchpin in determining the admissibility of identification testimony." *Id.* at 114; *see also United States v. Wise*, 515 F.3d 207, 215 (3d Cir. 2008). The central question is "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." *Brathwaite*, 432 U.S. at 106 (quoting *Biggers*, 409 U.S. at 199); *see also United States v. Moloney*, 513 F.3d 350, 355 (3d Cir. 2008). Courts look to the totality of the circumstances to determine whether the identification procedure was so suggestive as to give rise

45

to any substantial likelihood of irreparable misidentification. *Stovall v. Denno*, 388 U.S. 293, 302 (1967). Factors to be considered include: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199. Significantly, the Supreme Court has ruled that, where "identifications were entirely based upon observations at the time of the [incident] and not at all induced by the conduct" of the pretrial identification procedures, the identification does not violate due process. *See Coleman v. Alabama*, 399 U.S. 1, 7 (1970).

Here, Petitioner had a full *Wade* hearing on the challenged identifications. Based on the testimony at the *Wade* Hearing, the trial court, in its written opinion, rejected each of Petitioner's challenges to the identifications. The court found that the police had interviewed Barra and Safar together for only a brief period at the gas station and were not interviewed together or shown the photo array together at the Homicide Headquarters. (ECF No. 18-12, at 8-9.) The court also rejected Petitioner's argument that the failure to preserve the photo array shown to Barra justified exclusion, finding that there was no bad faith on the part of the police or prejudice to Defendant. (*Id.* at 9.)

The court also found that the photo array was not impermissibly suggestive and was reliable:

> In the present case, this court reviewed the photo array admitted at the hearing. While it may be true that Defendant's photo was a mere Polaroid picture as opposed to a BCI photo, this court nevertheless finds that the photos did not differ tremendously. The same holds true in regard to the general appearance of the individuals themselves portrayed in the photos. As such, this court fails to find that the array was "impermissibly suggestive." *State v.*

46

*Rodriguez*, 264 N.J. Super. 261, 269 (App. Div. 1993), *cert. granted*, 135 N.J. 3 (1994) ("Our cases have ... held that even where photographs differ from others in the array, that does not render them impermissibly suggestive.").

In reaching this decision, this court further recognizes several additional claims made by Defendant regarding the array - namely, that the investigators chose photos matching Defendant's physical appearance, as opposed to a general description provided by the witnesses the investigators failed to give the witnesses a "zero choice" when examining the array and, Molina knew which photo represented the suspect. Nevertheless, this court finds that these circumstances fail to render the array "impermissibly suggestive". First, although photo arrays should generally contain photos resembling a witness's description, in the present case, the photos depicted individuals at least semi-indicative of the witness's description - namely, black women, with an average height and "skinny" build. In addition, Barra testified at the hearing that, if he did not recognize the woman to whom he sold gas, then he would not have selected any of the photos. In regard to Safar, this court finds that his immediate and absolute identification of Defendant's photo negates any problems associated with the lack of "zero choice." Finally, there is no evidence that, because Molina knew which picture represented the suspect, she gave unconscious cues to the witnesses. Thus, the array was not "impermissibly suggestive."

Regardless of this finding, this court also finds that the array identifications are otherwise reliable. Based on the factors set forth above regarding the totality of the circumstances surrounding the witnesses's identifications, this court holds that the array identifications are admissible at trial. Upon reviewing the testimony at the hearing, this court finds that, based on the totality of the circumstances, the identifications made by Barra and Safar are admissible.

Both witnesses testified that they had the opportunity to view Defendant in well-lit areas on the night in question. Also, Safar testified that he was 100% certain of his identification of Defendant from the photo array, and Barra was almost certain. Upon viewing Defendant in the show-up, Barra identified Defendant with 100% certainty. In addition, both witnesses described the clothing that Defendant wore to the gas station that evening, and later positively identified the clothing when shown it by the detectives.

In addition, Defendant asserts that the identifications made by Barra should also be suppressed due to the show-up performed

at the Homicide Headquarters. However, New Jersey courts have held that such one-on-one show-ups do not taint identifications, *per se. See, e.g, State v. Thomas*, 107 N.J. Super. 128, 132 (App. Div. 1969). *See also State v. McNeil*, 303 N.J. Super. 266, 271-72 (App. Div. 1997) (one-on-one show-up reliable because occurred shortly after witness viewed defendant); *State v. Wilkerson*, 60 N.J. 452, 461-62 (1972). CL *State v. Johnson*, 138 N.J. Super. 579, 584 (App. Div. 1976); *State v. Ford*, 165 N.J. Super. 249, 253 (App. Div. 1978) (showing of single photo not always impermissible). In general, the use of such show-ups goes to the weight of the evidence, rather than the admissibility. *Id.* That is, the resultant identification from the show-up is not generally excluded at trial; rather, the jury decides the appropriate weight to afford the identification. *Id.*

The trial court also found that the show-up identification of Petitioner made by Barra was

reliable under the totality of the circumstances approach:

> Additionally, this court finds that the show-up identification is otherwise reliable. Once again, upon examining the "totality of the circumstances" surrounding the identification, this court holds that the identification made by Barra during the show-up is otherwise reliable, and therefore admissible at trial. *State v. Cherry, supra. See also State v. Carter*, 91 N.J. 86, 129-30 (1982).

*Id.* at 12-13. Finally, the court held that Safar's identification of Petitioner was both non-

suggestive and reliable:

> This court holds that Safar's identifications of Defendant are admissible regardless of the "unconscious transference" issue[17] raised by Defendant. This court notes that Safar had the opportunity to view Defendant repeatedly due to the fact that she was a regular customer. Moreover, on the relevant morning, Safar had ample opportunity to view Defendant in a well-lit area. Finally, Safar specifically identified the clothing that Defendant allegedly wore on the morning in question, as well as the car that Defendant drove on that particular day. As such, this court finds Safar's identification non-suggestive, and otherwise trustworthy and reliable.

(ECF No. 18-12, at 13.)

---

[17] At the *Wade* hearing, the court heard expert testimony regarding the issue of unconscious transference.

This Court has reviewed the relevant record, including the testimony from the *Wade* Hearing, and agrees with the trial court that the challenged identifications by these two Witnesses were reliable and thus properly admitted at trial. Therefore, Petitioner cannot show actual prejudice for her procedural default with respect to the Identification Claim, *see Murray*, 477 U.S. at 494, and the Court will deny habeas relief on Ground Eight.

### 2. Ground Nine – Miranda Claim

Nor can Petitioner show cause or actual prejudice with respect to her *Miranda* Claim. Prior to trial, Petitioner moved to suppress nine statements that she gave to Jersey City police detectives prior to being arrested and charged.[18] (ECF No. 18-3.) At a two day hearing, the trial court found the following five statements to be admissible, and they were not suppressed:

> Statement #1: Are you the ones they sent for me? (ECF No. 18-4 at 2 - 3)
>
> Statement #2: I'm the one everyone is blaming for the fire but I don't give a shit, I just want to report that this man stole my pocketbook and my hubcap. ? (ECF No. 18-4 at 2 - 3)

---

[18] The trial court suppressed the following four statements as inadmissible:
> Statement #5: The dog will probably sniff gasoline on my back seat on the passenger side because I just had my tires changed at the used tire guys on Grand Street and they put them on my backseat, they probably had gas on them.
>
> Statement #6: A comment by petitioner that she also had work done on her axle recently, and that could have put gas there as well.
>
> Statement #7: Petitioner's formal taped statement
>
> Statement #9: Oh well, life goes on.

*Id.* With leave of court, the State appealed the suppression of Statements #5 and #6. (ECF No. 18-7.) The Appellate Division affirmed the suppression. (ECF No. 18-9 at 5-6.)

Statement #3: A comment by petitioner that she did not start any fires and she was in the basement apartment when it started. (ECF No. 18-4 at 6 and 11-14)

Statement #4: A comment by petitioner that she was undressed, lying in bed when she smelled smoke, she went to see why, went back and got dressed, putting on bedroom slippers and the certain clothes. (ECF No. 18-4 at 15)

Statement #8: This is what I get for cooperating with the police. I should never have said anything to you. (ECF No. 18-4 at 19)

(ECF No. 18-4 at 20-21; ECF No. 18 at 124-125.)

In Ground Nine, Petitioner contends that these statements warrant suppression because

"(a) they were made without giving *Miranda* warnings"; (b) because the police failed "to

scrupulously honor Petitioner's invocation of her right to silence"; and (c) "because the

statements were not voluntarily given." (Am. Pet., ECF No. 3 at 44.)

Consistent with the Fifth Amendment right against self-incrimination and the Due

Process Clause of the Fourteenth Amendment, the United States Supreme Court held in *Miranda*

*v. Arizona*, 384 U.S. 436 (1966):

> [W]hen an individual is taken *into custody or otherwise deprived of his freedom* by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the

50

> prosecution at trial, no evidence obtained as a result of interrogation
> can be used against him.

*Miranda*, 384 U.S. at 478-79 (emphasis added). *Miranda* warnings are required when an individual is subject to custodial interrogation. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. at 444. In subsequent decisions, the Supreme Court specifically stressed that it was the custodial nature of the interrogation which triggered the necessity for adherence to the specific requirements of *Miranda*. *See Stansbury v. California*, 511 U.S. 318, 322 (1994) ("[The] obligation to administer *Miranda* warnings attaches, however, 'only where there has been such a restriction on a person's freedom as to render him [or her] "in custody"'") (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)); *Illinois v. Perkins*, 496 U.S. 292, 296 (1990) ("*Miranda* was meant to preserve the privilege [against self-incrimination] during 'incommunicado interrogation of individuals in a police-dominated atmosphere.' ... '*Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated'") (citations omitted)); *Roberts v. United States*, 445 U.S. 552, 560 (1980) ("*Miranda*'s requirement of specific warnings . . . does not apply outside the context of the inherently coercive custodial interrogations for which it was designed"). *See also*, *e.g.*, *United States v. Walton*, 10 F.3d 1024, 1028 (3d Cir. 1993) (explaining "[t]his is not a *Miranda* case" because the conversation the defendant had with Federal agents "occurred in a noncustodial setting"). In determining whether a custodial interrogation has occurred, a court must examine all of the circumstances surrounding the interrogation. *Stansbury*, 511 U.S. at 322.

51

To comport with constitutional guarantees, statements must also have been made voluntarily. *Chavez v. Martinez*, 538 U.S. 760, 769-70 (2003). The voluntariness of a statement must ultimately be assessed under the totality of the circumstances, considering such factors as the defendant's intelligence, the length of detention, the nature of the interrogation, and the use of any physical force against the defendant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The inquiry focuses on whether the defendant's free will was overborne by any improper influence of law enforcement. *Haynes v. Washington*, 373 U.S. 503, 513 (1963) (where voluntariness is concerned, "the question in each case is whether the defendant's will was overborne at the time he [or she] confessed"); *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir.), ("To determine the voluntariness of a confession, the court must consider the effect that the totality of the circumstances had upon the will of the defendant."), *cert. denied,* 479 U.S. 989 (1986). The Supreme Court has made clear that a statement is involuntary when the suspect's "will was overborne in such a way as to render his confession the product of coercion." *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991). In determining whether a statement is voluntary, Supreme Court precedent requires consideration of "the totality of all the surrounding circumstances-both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth*, 412 U.S. at 226). These surrounding circumstances include "not only the crucial element of police coercion, *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)," but may also include "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health." *Withrow v. Williams*, 507 U.S. 680, 693 (1993). "[S]ubsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the *Miranda* warnings, often require the resolution of

conflicting testimony of police and defendant. The law is therefore clear that state-court findings

on such matters are conclusive on the habeas court if fairly supported in the record and if the

other circumstances enumerated in § 2254(d) are inapplicable." *Dickerson*, 474 U.S. at 117.

In deciding Petitioner's motion to suppress (ECF No. 18-3), the trial court analyzed the

totality of the circumstances in which Petitioner made the Five Statements:

The trial court found that Statements #1 and #2 were admissible:

> . . . for two basic reasons. On March 2 and 3, 1999, this court held
> a *Miranda* hearing. At the *Miranda*, hearing, Defendant conceded
> the admissibility of these two statements. [ECF No. 18-58 at 47.]
> Secondly, the admission of these statements comports with New
> Jersey jurisprudence. For example, in *State v, Jones*, 308 N.J.
> Super. 15, 25 (App. Div. 1998), the court held that a defendant's
> statements were admissible, where the defendant himself
> approached the police, volunteered information to the officers
> about the relevant crime, remained unrestrained, and avoided
> formal interrogation. Here, as set forth above, Defendant appeared
> outside the West District precinct on her own volition. Moreover,
> she approached the officer's patrol car herself, and then
> immediately made the first statement to the officers. Defendant
> then supplemented that statement with an additional comment.
> During this time, Defendant remained unrestrained. Moreover, the
> officers did not subject Defendant to interrogation; for the
> responses to the initial statement – "Yes" and "what happened?" -
> do not rise to the level of interrogation. As such, these statements
> are admissible. (ECF No. 18-4 at 3.)

As the trial court observed, Petitioner's Fifth Amendment right against self-incrimination

and the Due Process rights under the Fourteenth Amendment were not implicated in the non-

custodial and voluntary scenarios in which Statements #1 and #2 were made. Petitioner was not

yet a suspect. She was not in custody and she was not under arrest. She was not handcuffed as a

suspect would have been. Thus, the circumstances did not indicate a custodial interrogation and

that *Miranda* warnings were not required at that point. Those oral statements were voluntary

under the totality of the circumstances, taking into account all of the circumstances. The

Petitioner was not physically or psychologically pressured. Statements #1 and #2 were not the

product of custodial interrogation and were voluntarily made.

The trial court found that Statement #3 was admissible because:

> . . . law enforcement personnel did not subject Defendant to
> interrogation, but rather Defendant volunteered the statement."

(ECF No. 18-4 at 6.) As further explained by the trial court:

> [W]hether or not "custody" existed at the time Defendant made the
> statement [#3], Defendant nevertheless volunteered said statement
> in the absence of any interrogation by Detective Sandifer nor any
> other law enforcement personnel. At the hearing, Detective
> Sandifer testified that Defendant made the statement on her own,
> and not in response to any question by him. The *Miranda* rule does
> not come into play unless a statement is the product of custodial
> interrogation. In the absence of interrogation, a volunteered or
> spontaneous remark by a suspect is admissible in evidence
> regardless of the absence of *Miranda* warnings. Thus, the third
> statement - that she did not start any fires and that she was in the
> basement when the fire started - is admissible at trial as well.

(ECF No. 18-4 (04/06/99 Op.) at 12.)

Similarly, the trial court found that Statement #4 was also volunteered by Petitioner:

> At the [*Miranda*] hearing, Detective Sandifer testified that he
> looked at Defendant's clothing, because he was 'taken aback' in
> part by the fact that Defendant had no shoes. According to
> Detective Sandifer, he and Defendant merely looked at each other.
> It would be a hard sell for this court to hold that the detective's
> action of noticing Defendant's clothing constitutes "interrogation"
> for Miranda purposes. Thus, once again, this court holds that the
> statement was "volunteered," and thus admissible at trial.

(ECF No. 18-4 at 13.)

Finally, the trial court determined that Statement #8 was an admissible statement

because:

> Upon notifying Defendant of her *Miranda* rights, and refusing to
> sign a waiver form, Defendant nevertheless volunteered the
> statement. As set forth above, volunteered statements are

54

> admissible, despite custody and interrogation considerations, and
> despite whether *Miranda* warnings had been administered.

(ECF No. 18-4 at 19.)

Having reviewed the relevant record, including the *Miranda* hearing transcript (ECF Nos. 18-55, 18-56, 18-57 and 18-58) and the trial court's opinion, the Court agrees with the trial court's finding that: (a) Statements #1 and #2 were voluntary statements in a non-custodial situation and (b) Statements #3, #4 and #8 were non-coerced, voluntary statements. Because the statements were properly admitted and not subject to exclusion under *Miranda*, the Court finds that Petitioner cannot show actual prejudice sufficient to overcome procedural default with respect to the *Miranda* Claim and will deny habeas relief on Ground Nine.

## VI.   **CERTIFICATE OF APPEALABILITY**

Pursuant to 28 U.S.C. § 2253(c), a petitioner may not appeal from a final order in a habeas proceeding unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). For the reasons expressed above, jurists of reason could not disagree that Petitioner's claims are lacking in merit. Therefore, no certificate of appealability will issue pursuant to 28 U.S.C. § 2253(c)(1)(B). *See* Fed. R. App. P. 22(b)(1); 3d Cir. L.A.R. 22.2.

## VII.  **CONCLUSION**

For the reasons expressed in this Opinion, the Court denies the Amended Petition and denies a certificate of appealability. An appropriate Order follows.

Madeline Cox Arleo, District Judge
United States District Court

Dated: _____, 2017